UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                        )
VINCENT E. STUART,                                      )
                                                        )
                        Plaintiff,                      )
                                                        )
v.                                                      )          Civil Action No.: _____
                                                        )
TOWN OF FRAMINGHAM, and                                 )
BRIAN SIMONEAU, Assistant to the                        )
Chief of Police of the Town of Framingham,)
individually,                                           )
                                                        )
                        Defendants.                     )
_____)

## COMPLAINT AND JURY DEMAND

1.      By this action, Plaintiff Vincent E. Stuart ("Lt. Stuart"), a 16-year veteran of the

Framingham Police Department ("FPD"), seeks redress against the Assistant to the Chief of

Police of the Town of Framingham, Brian Simoneau ("Mr. Simoneau"), and the Town of

Framingham ("the Town") for violating Lt. Stuart's federal civil rights and the Massachusetts

Public Employee Whistleblower Statute, M.G.L. c. 149, §§ 185 *et seq.*

2.      Defendants trumped up charges against Lt. Stuart and suspended him in

retaliation after he complained about and attempted to stop Mr. Simoneau, the Chief of Police's

top advisor, who was not a trained and qualified Police Officer, from indulging his Police Officer

fantasy and pretending to be a regular Police Officer.

3.      Many years earlier, while serving as a dispatcher for the FPD, Mr. Simoneau had

been bestowed the honorific title, "Special Police Officer," a title which in past practice allowed

one to work paid details but not otherwise act as a regular Police Officer.  However, Chief of

Police Kenneth Ferguson ("Chief Ferguson"), who felt a debt of gratitude towards Mr.

Simoneau, indulged Mr. Simoneau's Police Officer fantasy by giving Mr. Simoneau a gun, uniform, citation book, a police cruiser with siren, lights, police radio, and even a traffic light changing fob for use in his personal vehicle.  Thereafter, Mr. Simoneau began conducting traffic stops, issuing citations, responding to police calls, and inserting himself in active crime scene investigations despite the fact that, unlike qualified Police Officers, he had never been screened for physical and psychological fitness, he had received no field training, and he lacked any significant, relevant experience.

4.     Prior to spearheading the charge to bring an end to Mr. Simoneau's free reign that threatened the physical safety of suspects, bystanders and the police, endangered the integrity of criminal investigations, and raised significant legal liability issues for the FPD, Lt. Stuart was recognized as an exceptional law enforcement officer and had never been suspended.  Almost immediately after Lt. Stuart voiced his concerns about Mr. Simoneau's conduct, Mr. Simoneau embarked on an unabashed and unrelenting campaign of retaliation against Lt. Stuart, which resulted in Lt. Stuart suddenly being on the receiving end of a series of adverse employment actions choreographed by Mr. Simoneau.

5.     First, Mr. Simoneau instituted several unpopular policy changes which adversely affected Lt. Stuart, and Mr. Simoneau saw to it that the other officers blamed Lt. Stuart for the changes.  Then, Mr. Simoneau conducted a secret, unauthorized and completely biased investigation into Lt. Stuart's timekeeping in the hope of getting Lt. Stuart fired and charged criminally (which ironically ended with the FPD owing Lt. Stuart for over 20 hours he worked, but for which he had not been paid).  Mr. Simoneau's retaliation campaign came to a head when Lt. Stuart filed a complaint against another Officer who was one of Mr. Simoneau's favorites.  Mr. Simoneau's retribution was swift, immediate and effective.  Rather than investigate the other

Officer's alleged wrongdoing, Mr. Simoneau, with the knowledge and approval of Chief Ferguson, seized upon this opportunity to ***investigate Lt. Stuart*** and, specifically, whether Lt. Stuart had knowingly put false information into his complaint.  This tactic of turning the tables against a complainant had been used multiple times in recent years by Mr. Simoneau and Chief Ferguson to rid the department of those who dared to speak up against police wrongdoing. Unsurprisingly, at the end of the investigation, Lt. Stuart was placed on administrative leave where he remains today, four months later.

## PARTIES

6.      Plaintiff Lt. Stuart is an individual who resides in Framingham, Middlesex County, Massachusetts.

7.      Defendant Town of Framingham is a body politic situated in Middlesex County, Massachusetts.

8.      Defendant Brian Simoneau is an individual who resides in Ashland, Middlesex County, Massachusetts.  At all relevant times, he served as Assistant to the Chief of Police.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it involves a claim for violation of 42 U.S.C. § 1983.

10.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant Simoneau resides in this district, and a substantial part of the events or omissions giving rise to the claims at issue occurred in this district.

## FACTS

### *Lt. Stuart*

11.     Lt. Stuart is a former United States Marine who spent four years on active duty with two overseas deployments as a United States Marine Corps Scout Sniper.  After his honorable discharge and three years as a Police Officer in Honolulu, Hawaii, Lt. Stuart returned to his hometown of Framingham.

12.     Lt. Stuart began with the FPD in 2000 as a Police Officer.  In 2008, he was promoted to Police Sergeant, and in 2014, he was promoted to Police Lieutenant.

13.     Lt. Stuart was on the FPD SWAT Team for 13 years, rising through the ranks from Operator to SWAT Team Leader, and he was the Team Leader on the ground for the FPD SWAT Team during the hunt for the Tsarnaev brothers in Watertown in 2011.

14.     Prior to his unlawful suspension, Lt. Stuart had been the Commanding Officer of the FPD's Weapons Training Unit for approximately 3.5 years.  This unit is responsible for all Firearms training and Less Than Lethal Weapons training.  Lt. Stuart was a Firearms Instructor, a Patrol Response to Active Shooter Instructor, and was one of the first Master TASER Instructors in the Commonwealth of Massachusetts.

15.     When he was a Sergeant, Lt. Stuart served as Patrol Supervisor of the Evening Shift.  When he was promoted to Lieutenant, he became Shift Commander of the Evening Shift. He was also one of the original members of the FPD's Street Crimes Unit and a Narcotics Detective.

16.     Prior to his unlawful suspension, Lt. Stuart was also the FPD's Tactical Operations Commander and liaison to the Massachusetts State Police STOP Team, responsible

4

for all tactical law enforcement responses involving situations in Framingham that rise above the capabilities of a Uniformed Patrol response.

17.     Several years ago, Lt. Stuart was elected to the six-member Executive Board of the Framingham Police Superior Officers Association ("FPSOA"), which represents the 27 Sergeants and Lieutenants of the FPD.

18.     Lt. Stuart is highly decorated.  He has been awarded the Meritorious Service Medal, three Police Commendation Medals, the Police Service Award, the Life Saving Award, the Years of Service Award with star, the Military Service Award, the 2013 Boston Marathon Award for actions following the terrorist bombings, and the Designated Patrol Rifle Marksman Badge.

19.     Throughout his career, Lt. Stuart has devoted himself to his law enforcement career, placing the public's safety at the forefront, and executing his responsibilities with honesty and integrity.

20.     Prior to becoming a Sergeant, Lt. Stuart received performance reviews, and they reflected his outstanding service to the Town of Framingham.  As a Sergeant and later, Lieutenant, per FPD policy, he did not receive official performance reviews, but Chief Ferguson praised him highly for, among other things, his development of a plan to address traffic problems which breathed life back into traffic enforcement and resulted in a substantial reduction in accidents and a large increase in traffic citations.  Chief Ferguson also praised him for substantially increasing the number of warrants that were executed.

21.     Lt. Stuart has always taken seriously his responsibility and legal obligation to report fellow police personnel who have violated rules and regulations and/or placed others in danger, especially after he was disciplined in or around 2006 for not reporting the misconduct of

5

a fellow officer who waived a gun around during a house party while intoxicated.  So, for example, in or about 2014 or 2015, Lt. Stuart reported a Patrol Officer who grew extremely angry over his poor performance, swore at two Sergeants, threw his keys on the counter, and stormed off.  Lt. Stuart ended up withdrawing the report after Chief Ferguson indicated that he would not reprimand the Patrol Officer for this behavior.

22.     Other examples of Lt. Stuart speaking up when he sees inappropriate police conduct include when Lt. Stuart reported a Police Officer who had spoken inappropriately to a domestic violence victim on a recorded line; and when, in or about January 2016, Lt. Stuart reported a Police Officer for failure to meet various standards for a Police Officer and failure to perform his duties after the Patrol Officer did not respond to calls, did not file reports on domestic violence calls, and was unable to qualify on the shooting range, among other things. These complaints made by Lt. Stuart were all sustained.

### ***Brian Simoneau***

23.     On information and belief, Mr. Simoneau first joined the FPD as a dispatcher in the 1990s after a short stint as a part-time Police Officer in Ashburnham, which ended after he crashed his police cruiser.

24.     On information and belief, Mr. Simoneau, who always longed to be a Police Officer, was given the honorific title of "Special Police Officer" sometime in the 1990s by former Chief of Police Brent Larrabee.

25.     While working full-time for the FPD as a dispatcher, Mr. Simoneau attended the Massachusetts School of Law, passed the bar, and opened a private law practice.

26.     During his regular FPD working hours, Mr. Simoneau has appeared in court on behalf of his private clients and has opened and operated an unregistered workplace investigations firm called Factfinder, LLC.

27.     Mr. Simoneau served as Assistant to the Chief for the previous Chief of Police, Steven Carl ("Chief Carl").  He provided administrative assistance to Chief Carl and assisted with the accreditation process, work scheduling, and research, among other similar things.  He had no substantive authority in internal affairs investigations.  He did not carry a gun or badge, have a police cruiser, perform traffic stops, or otherwise act in the manner of a regular Police Officer.

28.     At or about the time Chief Ferguson became the chief in 2013, Mr. Simoneau's role and authority was greatly increased.  Chief Ferguson relies upon Mr. Simoneau as his top advisor and regularly delegates his own responsibilities and decision-making to Mr. Simoneau, including those relating to policymaking and internal investigations.  Mr. Simoneau also appears in court as an attorney on behalf of the Town.  Mr. Simoneau reports directly to Chief Ferguson and is listed on the organization chart on the same level as the Chief.  He is not under the command of the three Deputy Chiefs.

29.     Feeling gratitude to Mr. Simoneau for, among other things, assisting him with his application to be Chief, Chief Ferguson gave Mr. Simoneau a gun (after he took a one-week basic firearms course for reserve officers), uniform, citation book, police cruiser with siren, lights, and police radio, and a traffic light changing fob for use in his personal vehicle. Thereafter, Mr. Simoneau began conducting traffic stops, issuing citations, responding to police calls, and inserting himself in active crime scene investigations despite, unlike qualified regular

Police Officers, not being screened for his psychological and physical fitness, and not having the necessary and appropriate education, field training, and experience.

### *Policies Regarding Officer Education and Training*

30.     At the time that Lt. Stuart complained about Mr. Simoneau's dangerous Police Officer fantasy, the FPD had no written policy regarding what, if any, regular Police Officer duties a Special Police Officer is permitted to undertake, and no standards for physical or psychological screening, physical fitness, field training, education, or ongoing in-service training for Special Police Officers.

31.     On information and belief, other than Mr. Simoneau, the Town has only one other Special Police Officer, a woman who works as a meter maid for the Town.  Unlike Mr. Simoneau, she has not been issued a gun, badge, uniform or cruiser, and the only police work she is permitted to do is work on paid details.

32.     Pursuant to written policy, to become a full-time Police Officer in Framingham, a non-lateral transferring candidate must pass an entrance exam and intense background investigation and complete multiple screening and oral interviews.  If selected for a position, the new hire must pass a comprehensive medical exam and undergo a battery of psychological screening/emotional stability examinations.  The new hire must also successfully complete a Physical Ability Test.  Next s/he must successfully complete a training program at a Massachusetts Police Training Committee ("MPTC") certified policy academy.  For full-time Police Officers, that training program is generally 800 hours over 20 weeks.  At that point, the new hire takes an oath of office and is sworn in by the Town Clerk and begins a one-year probationary period.

33.     During the probationary period, the new Police Officer participates in a 3-month Field Training Officers ("FTO") Program in which s/he is given saturation training by being

8

exposed to as many different types of calls as possible and is evaluated on a daily basis. Prior to completion of the FTO Program, the Officer is not employed into solo assignments.

34. On an ongoing basis, all full-time Framingham Police Officers receive annual in-service training and certification in, for example, firearms, defensive tactics (handcuffing, baton, pepper spray, escort positions, take downs, arm bars), First Responder skills including first aid, Cardiopulmonary Resuscitation ("CPR") and Automated External Defibrillator ("AED"), and Emergency Vehicle Operations. They are also formally evaluated once a year.

35. There are separate educational and training requirements for Reserve Officers, also known as Auxiliary Officers. In Framingham, Auxiliary Officers are unpaid volunteers who are prepared to assist the FPD in the event of a civil or natural disaster, or in the event that additional personnel are needed in any emergency. They provide assistance at many community activities in town.

36. Auxiliary Officers are required under state law to attend initial Reserve Officer training at a MPTC police academy. They also train and receive certification in First Responders' first aid, CPR and AED. After that, Auxiliary Officers receive field training. They are required to maintain their certifications in all equipment carried as well as first aid, CPR and AED. They attend ongoing monthly training sessions on subjects such as defensive tactics, verbal communication, narcotics, officer safety, fire safety, crime scene security, weapons of mass destruction, chemical and biological incidents, and communication protocol during critical incidents.

37. On information and belief, Mr. Simoneau has not been screened or evaluated and has not obtained the education and training needed to safely exercise the powers of a regular Police Officer. Mr. Simoneau never attended a full-time police academy training program.

Rather, Mr. Simoneau only took part in a part-time, reserve Police Officer training program many years ago.  Mr. Simoneau did not pass a comprehensive medical exam, a psychological screening/emotional stability exam, or a Physical Ability Test; he never received appropriate field training; his performance as a Police Officer was not evaluated on a yearly basis, or indeed ever, by the FPD; he never gained experience by working as a full-time Police Officer; he did not received annual training or certification in defensive tactics, first aid, CPR, AED or Emergency Vehicle Operations; and the only firearms training he received since attending the part-time program years ago was a one-week basic firearms course for reserve officers.

38.      Moreover, on information and belief, Mr. Simoneau has not even obtained the field training, certifications and ongoing training required of an Auxiliary Officer.

### *Lt. Stuart Complains That Mr. Simoneau's Misconduct Is a Threat to Public Safety*

39.      In or around April 2015, Lt. Stuart lodged a verbal complaint with Chief Ferguson concerning Mr. Simoneau.  The gist of what Lt. Stuart told Chief Ferguson was that Mr. Simoneau had been conducting motor vehicle stops, responding to police calls and appearing at active crime scenes, all without adequate screening, training and experience, and that by doing so he was endangering himself and the public as well as compromising police investigations and opening the FPD and all those who were responsible for hiring, training and supervising Police Officers to significant legal liability.

40.      Prior to April 2015, Lt. Stuart had mentioned to Chief Ferguson on several occasions his concerns about Mr. Simoneau's being allowed to act out his Police Officer fantasy, but their discussion in April was in-depth and lasted approximately one hour.

41.      The specific instances which led to Lt. Stuart's complaints concerning Mr. Simoneau in April 2015, included, but were not limited to,

a. On October 5, 2014, while driving in his personal vehicle, Mr. Simoneau conducted a motor vehicle stop on Hollis Street. Mr. Simoneau allowed both occupants to exit the vehicle, allowed the passenger to walk away, and allowed the driver to return to the vehicle and spend several minutes looking for his license, thereby committing multiple officer safety violations. Mr. Simoneau did not ask dispatch to send a marked unit, and he could not have issued a citation since he did not have his citation book with him. Later, when he was back at the station, Mr. Simoneau asked for the driver's record and learned that the driver had 26 entries on his record, including OUI and numerous drug offenses. Luckily for all involved, this traffic stop did not escalate into a larger situation.

b. On November 11, 2014, while in his police cruiser, Simoneau stopped a car on Concord Street for an illegal U-turn and issued a warning citation.

42.     Initially, Chief Ferguson agreed with the concerns that Lt. Stuart raised, but Chief Ferguson stated he was going to maintain the status quo because Mr. Simoneau did a lot of things for him which were not in Mr. Simoneau's job description. Chief Ferguson told Lt. Stuart to just ignore Mr. Simoneau.

43.     Over the ensuing month, Lt. Stuart continued to revisit with Chief Ferguson his concerns over Mr. Simoneau's free reign, the catalyst being at least two additional events which had transpired:

a. On April 22, 2015, Mr. Simoneau again responded to a Police call and interfered with an active crime scene. Framingham Police Officers were responding to 22 Rock Street for a reported breaking and entering. Two individuals fled the residence. There was a possibility that they were armed because guns were stolen from residence, so a perimeter was set up and tracking dogs were being deployed. Mr. Simoneau, driving in his cruiser with blue lights, having no reason to be there, and without providing notice to anyone that he was in the area, drove past or through the perimeter at least 6 to 7 times. This could have escalated into an explosive situation and significantly impeded the apprehension of the suspects.

b. On May 1, 2015, a call went out on the radio to Area A cars to respond to a fight on Hollis Street. While cars were responding, Mr. Simoneau, without identifying himself, used the police radio to ask for clarification of the call location and stated that there was "nothing showing yet." He then advised responding units to "slow down, it's a simple domestic." The time stamp on the calls indicates that Mr. Simoneau specifically drove to the call location

11

and was not responding simply because he was already "readily present."
When officers pulled up, Mr. Simoneau was out of his car. Inconsistent with
basic training, his gun was visible on his hip but his badge was not visible.
This which creates a serious safety issue.

44.     On each additional occasion that Lt. Stuart brought his concerns about Mr.

Simoneau to Chief Ferguson's attention, the Chief told Lt. Stuart to ignore Mr. Simoneau, and he

made it clear that he had no intention of taking any action against Mr. Simoneau which would

curb Mr. Simoneau's conduct.

45.     After multiple unsuccessful attempts to convince the Chief of the gravity of the

situation, Lt. Stuart brought his concerns to his union, the FPSOA. Because the FPSOA shared

Lt. Stuart's safety concerns about allowing an untrained individual to exercise the powers of a

regular Police Officer and the potential legal liability which may result from condoning such

reckless behavior, the decision was made to send a letter to Chief Ferguson signed by the

FPSOA Executive Board, rather than Lt. Stuart alone, with the hope that the Chief would take

the concerns more seriously than he had taken Lt. Stuart's prior complaints and that if the letter

came from the FPSOA rather than Lt. Stuart, individually, this would help insulate and protect

Lt. Stuart from retaliation by Mr. Simoneau.

46.     The letter was sent on or about June 5, 2015. *See* **Exhibit A** attached hereto. It

was signed by the six-member FPSOA Executive Board, of which Lt. Stuart was and continues

to be a member. Lt. Stuart was responsible for most of the contents of the letter. On information

and belief, Mr. Simoneau understood that Lt. Stuart had been the moving force behind, as well as

the primary author of, the letter.

47.     At or about the time the June 5, 2015 letter was sent and thereafter, Sgt. Scott

Brown, president of the FPSOA, also discussed with Chief Ferguson on multiple occasions his

and the FPSOA's concerns regarding Mr. Simoneau's acting out his police fantasy.

48.     Chief Ferguson's response to the ongoing concerns changed after he received this letter.  Chief Ferguson acknowledged to Sgt. Brown the dangers posed by Mr. Simoneau exercising the powers of a regular Police Officer.  Chief Ferguson told Sgt. Brown that he would see that Mr. Simoneau stopped acting as a Police Officer, but that he would not take away Mr. Simoneau's gun or badge.  Similarly, Chief Ferguson told Lt. Stuart that although he would not take Mr. Simoneau's "status perks" from him, such as the gun, badge, uniform and cruiser, Mr. Simoneau would only be allowed to take official police action if directly authorized by Chief Ferguson and that Chief Ferguson would never provide this direct authorization.

49.     Despite Chief Ferguson's statements on the subject, he failed to bring Mr. Simoneau's Special Police Officer activities to a halt.  While Mr. Simoneau scaled back his playing at pretend cop, he never stopped altogether.  For example, on or about March 31, 2016, Mr. Simoneau appeared on the scene of a motor vehicle accident at 89 Bethany Road.  He reported that there were ***no injuries***, and waived off the ambulance.  When regular Police Officers arrived on the scene, they saw that in fact the vehicle's air bags had been deployed and so, pursuant to basic training, called for an ambulance.  The Fire Department arrived and transported a mother and child to the emergency room ***with injuries***.

### *Mr. Simoneau's Campaign of Retaliation Against Lt. Stuart*

50.     Following Lt. Stuart's efforts to stop Mr. Simoneau from acting upon his Police Officer fantasy, Mr. Simoneau targeted Lt. Stuart and began executing a series of retaliatory actions.

51.      The first retaliatory act that Mr. Simoneau took against Lt. Stuart took place less than two weeks after the June 5, 2015 letter was sent by the FPSOA Executive Board – Mr. Simoneau convinced Chief Ferguson to shut down the Active Shooter/Patrol Rifle monthly

training team which Lt. Stuart had created and overseen.  In or about 2013, Chief Ferguson had

shut down the SWAT Team because he felt it was inconsistent with the concept of "community

policing."  Lt. Stuart then persuaded Chief Ferguson that, in addition to the regular training the

entire department received on an annual basis, several Patrol Officers from each shift should

receive additional monthly training so there would be highly trained officers available 24 hours

per day who could take on leadership roles in the event of an active shooter incident.  Mr.

Simoneau took great pleasure in shutting down the Active Shooter/Patrol Rifle monthly training

team, and did not hide his joy in doing so.  Sgt. Brown observed Mr. Simoneau leaving Chief

Ferguson's office while clapping his hands in satisfaction and bragging about having shut it

down.

     52.    In a second retaliatory move, Mr. Simoneau, who was responsible for all FPD

policies, changed the booking policy so that Shift Commanders, like Lt. Stuart, were required to

personally book and process all prisoners.  Prior to this change, it was common past practice for

Shift Commanders to let Shift Supervisors (Sergeants) do the bookings, though Shift

Commanders remained responsible for all prisoners.  It was found that this enabled bookings to

go much more smoothly, especially when there were multiple arrests at the same time, because

Shift Supervisors who were present at the arrest had first-hand knowledge of the facts

surrounding the arrests.

     53.    Mr. Simoneau's change to the booking policy was extremely unpopular among the

Shift Commanders.  They nicknamed it "the Stuart Policy" because they knew Mr. Simoneau

had made this change to punish and undermine Lt. Stuart, who had recently complained about

Mr. Simoneau acting out his Police Officer fantasy.

54.     In or about August 2015, Mr. Simoneau began a third retaliatory action against Lt. Stuart.  Mr. Simoneau, who had been searching for something he could use against Lt. Stuart in order to have him terminated, decided to conduct a clandestine and unauthorized investigation into Lt. Stuart's work hours in the hope of catching him cheating the FPD.  Specifically, Mr. Simoneau clandestinely obtained video footage over several months from surveillance cameras at the FPD which showed Lt. Stuart leaving prior to the end of his shift on multiple occasions. To an outsider, this would appear to be an obvious violation.  However, Mr. Simoneau was not an outsider; he knew of the long-standing practice and unwritten policy allowing Commanding Officers to flex out early so long as two ranking officers were present and the Commanding Officer made up the time within a week or so.  Mr. Simoneau purposefully did not obtain video footage showing Lt. Stuart arriving *early* to make up the time, nor did he obtain records from the keyless entry fob system which showed when Lt. Stuart arrived early.

55.     According to Dep. Chief Slattery, Mr. Simoneau told him that he monitored the cameras at the station in order to catch Lt. Stuart leaving early because he wanted to collect enough examples so that Chief Ferguson would have no choice but to fire Lt. Stuart and he also wanted Lt. Stuart to be charged criminally.  Dep. Chief Slattery reported that Mr. Simoneau asked him not to tell Chief Ferguson about the secret monitoring.  Dep. Chief Slattery stated that Mr. Simoneau had been vocal about his strong dislike for Lt. Stuart.

56.     Mr. Simoneau's secret, unauthorized and biased investigation was done with complete disregard for and in violation of the FPD Policy on Professional Standards & Internal Affairs 10-1 which sets forth the manner in which investigations into possible violations of FPD rules and regulations and criminal statutes are to be conducted.  Among other things, this policy requires initial review of the complaint by the Chief of Police to determine if the allegations

constitute a violation of professional standards or criminal activity.  It also provides for written notice to the person being investigated.

57.     At or about the same time, Mr. Simoneau began a series of Facebook posts which provide further evidence of the retaliatory nature of his so-called investigation.  Mr. Simoneau posted about a police lieutenant in Texas who was facing trial for alleged timesheet fraud.  FPD Officers who saw the posts recognized them as Mr. Simoneau taunting Lt. Stuart.

58.     Despite Mr. Simoneau's request that he keep the secret, unauthorized investigation from Chief Ferguson, Dep. Chief Slattery decided to tell Chief Ferguson.  Chief Ferguson directed Dep. Chief Slattery to open an official investigation and oversee it.

59.     On or about October 29, 2015, Dep. Chief Slattery called Lt. Stuart into his office, told him about Mr. Simoneau's unauthorized investigation, and handed him a Notice of Investigation into whether Lt. Stuart had absented himself from scheduled work shifts without charging himself for the time.  Within a week, Chief Ferguson took over the investigation himself.

60.     Lt. Stuart asked to see the video tapes that Mr. Simoneau had made.  Chief Ferguson initially said yes, but shortly thereafter changed his mind.  On information and belief, Chief Ferguson changed his mind after discussing the request with Mr. Simoneau.

61.     Lt. Stuart asked for records of his keyless fob entries.  Chief Ferguson initially said yes, but shortly thereafter changed his mind.  On information and belief, Chief Ferguson changed his mind after discussing the request with Mr. Simoneau.

62.     Despite the FPD's refusal to give him access to the evidence he needed to clear his name, Lt. Stuart was able to obtain his fob entry records from another officer.  Those records

proved conclusively that not only had he made up all of the time on the days when he left early, but in fact the FPD owed him for over 20 hours.

63.     When faced with this incontrovertible evidence, Chief Ferguson was left with no alternative but to conclude that Lt. Stuart had not absented himself without charging himself for the time off.  Lt. Stuart had been fully exonerated.

64.     Nevertheless, Chief Ferguson issued Lt. Stuart a reprimand for not properly documenting his use of flex time on the ground that Lt. Stuart had not indicated in the notes section of his time records that he was flexing in or out.  On information and belief, such notations were routinely not entered by others who flexed in and out.

65.     After these several, unsuccessful attempts to inflict harm on Lt. Stuart, Mr. Simoneau tried for a fourth time, and it worked.  In or about October 2015, Lt. Stuart, who was Commanding Officer of the FPD's Weapons Training Unit and was responsible for all Firearms training and Less Than Lethal Weapons training, brought to Chief Ferguson his concerns about one of his previous instructors.  Based on there being no certification on record in the FPD files and his looking into it, Lt. Stuart reasonably believed that the instructor had been teaching Less Lethal Impact Munitions courses for about eight years without the proper certification and thereby collecting substantial overtime pay for which he was not entitled, which was a criminal violation.

66.     Under the FPD Policy of Professional Standards & Internal Affairs 10-1, Lt. Stuart was obligated to report this misconduct.  This obligation had been underscored for him ten years earlier when he was reprimanded for not reporting a fellow officer who waived a gun at a house party.

67.     After several unsuccessful attempts over the next several months to persuade Chief Ferguson to take his concerns about the instructor seriously, Lt. Stuart prepared a detailed, written complaint and, on May 26, 2016, delivered it to Dolores Hamilton in the Town's Human Resources ("HR") Department.  Lt. Stuart asked for a full investigation because the allegations, if proven to be true, could result in criminal charges against the instructor.

68.     Ms. Hamilton referred the matter back to Chief Ferguson, and on June 6, 2016, Chief Ferguson gave Dep. Chief Brandolini a copy of Lt. Stuart's complaint concerning the instructor.

69.     In short order, the subject of the investigation turned from the instructor's alleged wrongdoing *into Lt. Stuart* and, specifically, whether Lt. Stuart had knowingly put false information into his complaint.  On information and belief, this was as a result of Mr. Simoneau's influence.

70.     On August 8, 2016, after the investigation had been underway for two months, Lt. Stuart was handed a copy of a Notice of Investigation signed by Dep. Chief Brandolini, at the direction of Chief Ferguson, stating that Lt. Stuart was being investigated for submitting his complaint about the instructor.  He was also handed a Notice of Suspension dated two days earlier, which was also signed by Dep. Chief Brandolini at the direction of Chief Ferguson, informing him that he was placed on administrative leave

>   because an investigation is being conducted regarding your submission of a 14 page "Report of Misconduct," wherein you accuse another Framingham Police Lieutenant of criminal conduct.  By submitting this report, you may have violated various rules, regulations, policies, procedures, and the law.

71.     Thus, Lt. Stuart, who had an unblemished disciplinary record over 16 years, except for one minor reprimand, found himself on the receiving end of an Internal Affairs investigation, his second in a matter of months, and also found himself relieved of his duties.

18

72.     When Dep. Chief Trask handed Lt. Stuart the Notice of Investigation and Notice of Suspension, he asked Lt. Stuart if he would prefer that Mr. Simoneau not be involved in the investigation given Mr. Simoneau's prior unsanctioned investigation targeting Lt. Stuart.  Lt. Stuart stated Mr. Simoneau should not be involved in any respect and Dep. Chief Trask said he would not be.  Dep. Chief Brandolini, Ms. Hamilton and Sgt. Brown were present for this conversation.

73.     Despite assurances that Mr. Simoneau would not be involved in the investigation, it was apparent that he was.  For example, although Dep. Chief Brandolini conducted the formal interview of Lt. Stuart on August 17, 2016, the questions he asked were written by Mr. Simoneau.  Chief Ferguson admitted to Sgt. Brown that Mr. Simoneau wrote the questions. Also, during Dep. Chief Brandolini's interview of Lt. Stuart, a break was taken.  During the break, Dep. Chief Brandolini met with Mr. Simoneau in their shared office.  When the interview resumed, Dep. Chief Brandolini had new handwritten questions interspersed between the typewritten questions and he asked those follow-up questions.  Earlier in the interview, Dep. Chief Brandolini did not ask follow-up questions, but merely asked the typewritten questions. Additionally, based on the content and language used, the report that was signed by Dep. Chief Brandolini entitled, "Report of Investigation Re: 'Report of Misconduct' Submitted by Lt. Vincent E. Stuart," dated September 30, 2016 ("Report of Investigation"), was actually written by Mr. Simoneau, who is an attorney, not Dep. Chief Brandolini whose own writing style is quite different.

74.     The Report of Investigation upon which the FPD relies in continuing Lt. Stuart's suspension in fact *validates* Lt. Stuart's complaint by demonstrating that the instructor had been uncertified for a lengthy period.  Although Lt. Stuart had suspected that the instructor had failed

to recertify in 2006, meaning he was without certification for approximately 8 years, the Report concluded that the instructor obtained a five-year certification in 2006, meaning that he was uncertified from June 2011 going forward, or for approximately 2 years and 8 months.  The Report of Investigation found that there was insufficient evidence to conclude that Lt. Stuart had knowledge of the 5-year 2006 certification, which was not in the FPD files.  In other words, Lt. Stuart did not knowingly file a false complaint.  Nevertheless, the Report goes to great lengths to comb through Lt. Stuart's complaint and (falsely) conclude that Lt. Stuart included subsidiary statements in his complaint that were untrue, all in order to justify the continued suspension of Lt. Stuart.

75.     The integrity of the investigation into Lt. Stuart was completely undermined by Mr. Simoneau's involvement in it.  Given these facts, including Dep. Chief Brandolini's failure to put a stop to Mr. Simoneau's involvement when he knew Mr. Simoneau's participation was prohibited, and the broad and unfettered authority Mr. Simoneau exercised at the FPD, it is a reasonable inference that the outcome of the investigation was, in fact, dictated by Mr. Simoneau.

76.     On information and belief, the targeting of Lt. Stuart was done at the direction of Mr. Simoneau, with the knowledge and approval of Chief Ferguson.

77.     Mr. Simoneau was motivated not only by his anger over having been called out for being allowed to act out his Police Officer fantasy, but also by his anger over the fact that Lt. Stuart had alleged that one of his favorites had engaged in possible criminal activity.

78.     The retaliation suffered by Lt. Stuart was not an isolated event, but was part of a known, settled and widespread custom at the FPD of chilling employees' speech.  Prior examples

include, but are not limited to, employees who were retaliated against after reporting FPD

misconduct to the FBI and engaging in union activities.

## COUNT I
### (Retaliation under 42 U.S.C. § 1983 v. Brian Simoneau in his individual capacity)

79.    Plaintiff repeats the allegations set forth above as if fully contained herein.

80.    At all relevant times, Mr. Simoneau was acting under color of state law.

81.    When Lt. Stuart complained to Chief Ferguson about Mr. Simoneau's Police

Officer fantasy, he was speaking as a citizen on legitimate matters of inherent public concern

(*i.e.*, official malfeasance and public safety), thus his speech was protected under the First

Amendment to the United States Constitution.

82.    Lt. Stuart's (and the public's) interest in complaining about the dangers created by

Mr. Simoneau being allowed to act like a regular Police Officer when he was not properly

screened, educated or trained outweighed any interest Mr. Simoneau may have had in the

efficient performance of the FPD.

83.    Lt. Stuart's protected speech was a substantial or motivating factor in the adverse

employment actions taken against him by Mr. Simoneau, and Mr. Simoneau would not have

taken such adverse employment actions absent the protected conduct.

84.    As a direct and proximate result of Mr. Simoneau's violations of 42 U.S.C. §

1983, Lt. Stuart has suffered significant damages, including economic damages, damages to his

personal and professional reputation, and emotional distress.

85.    Lt. Stuart is also entitled to punitive damages because Mr. Simoneau acted with

evil motive or intent, recklessly or with callous indifference to Lt. Stuart's federally protected

rights.

<u>**COUNT II**</u>
**(Retaliation under 42 U.S.C. § 1983 v. Town of Framingham)**

86.     Plaintiff repeats the allegations set forth above as if fully contained herein.

87.     At all relevant times, Chief Ferguson was acting under color of state law.

88.     At all relevant times, Mr. Simoneau was acting under color of state law.

89.     At all relevant times, Chief Ferguson and/or Mr. Simoneau were officials of the Town of Framingham with the authority to set and establish the final official government custom or policy for the Town for taking the adverse actions (retaliation) that they took against Lt. Stuart.  As such, the various retaliatory actions described more fully above and the decision to place Lt. Stuart on administrative leave constituted an official custom or policy of the Town of Framingham.

90.     When Lt. Stuart complained to Chief Ferguson about Mr. Simoneau's Police Officer fantasy, he was speaking as a citizen on legitimate matters of inherent public concern, (*i.e.*, official malfeasance and public safety), thus his speech was protected under the First Amendment to the United States Constitution.

91.     Lt. Stuart's (and the public's) interest in complaining about the dangers created by Mr. Simoneau being allowed to act like a Police Officer when he was not properly screened, educated or trained outweighed any interest Chief Ferguson and/or Mr. Simoneau may have had in the efficient performance of the FPD.

92.     Lt. Stuart's protected speech was a substantial or motivating factor in the adverse employment actions taken against him by Mr. Simoneau with the knowledge and approval of Chief Ferguson, and Mr. Simoneau, with the knowledge and approval of Chief Ferguson, would not have taken such adverse employment action absent the protected conduct.

93.     The Town, through the conduct of Chief Ferguson and/or Mr. Simoneau, subjected Lt. Stuart, or caused him to be subjected, to the deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States.

94.     The Town and Chief Ferguson and/or Mr. Simoneau were deliberately indifferent to Lt. Stuart's federally protected rights when engaging in the conduct alleged above.

95.     As a direct and proximate result of the Town's violation of 42 U.S.C. § 1983, Lt. Stuart has suffered significant damages, including economic damages, damages to his personal and professional reputation, and emotional distress.

### COUNT III
### (Violation of M.G.L. c. 149, § 185(b)(1) v. Town of Framingham)

96.     Plaintiff repeats the allegations set forth above as if fully contained herein.

97.     Lt. Stuart engaged in protected activity by making an internal report to Chief Ferguson regarding Ms. Simoneau's Police Officer fantasy.

98.     Lt. Stuart brought Mr. Simoneau's dangerous and improper activities to the attention of the FPD by providing it with written notice via the June 5, 2015 letter signed by Lt. Stuart by virtue of his membership in the Executive Board of the FPSOA, and the FPD had a reasonable opportunity to correct the dangerous and improper activities; alternatively, no prior written notice was required pursuant to M.G.L. c. 149, § 185(c)(2).

99.     In retaliation for Lt. Stuart's protected conduct, the FPD engaged in the retaliatory conduct described more fully above and placed Lt. Stuart on administrative leave.

100.    Lt. Stuart's protected conduct played a substantial or motivating part in the FPD's retaliatory actions.

101.    Any non-retaliatory reasons for the adverse employment actions taken by the FPD, including placing Lt. Stuart on administrative leave, that the FPD may assert are pretextual.

23

102.     As a direct and proximate result of the Town's violation of M.G.L. c. 149, §

185(b)(1), Lt. Stuart has suffered significant damages, including loss of employment; lost wages,

benefits and other economic damages; costs and attorney's fees required to remedy the legal

wrongs done to him; damages to his personal and professional reputation; and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lt. Stuart requests that this Court grant the following relief:

i.     Enter judgment in favor of Lt. Stuart and against each Defendant on each and
every Count of the Complaint;

ii.     Order the Town of Framingham to reinstate Lt. Stuart as a member of the FPD,
with all the titles, duties and responsibilities Lt. Stuart held prior to June 2015,
pursuant to M.G.L. c. 149, § 185(d)(2);

iii.     Order the Town of Framingham to reinstate full fringe benefits and seniority
rights to Lt. Stuart, pursuant to M.G.L. c. 149, § 185(d)(3);

iv.     Award Lt. Stuart three times the lost wages, benefits and other remuneration, and
interest thereon, pursuant to M.G.L. c. 149, § 185(d)(4);

v.     Award Lt. Stuart additional compensatory damages in an amount to be proved at
trial for his injuries (including reputational harm, psychological injuries, pain and
suffering, emotional distress, and impaired earning capacity);

vi.     Award Lt. Stuart punitive damages as permitted by law;

vii.     Award Lt. Stuart all reasonable costs and attorney's fees pursuant to M.G.L. c.
149, § 185(d)(5) and as otherwise permitted by law;

viii.     Award Lt. Stuart pre- and post-judgment interest as permitted by law; and

ix.     Grant such other and further relief as this Court deems just and proper.

## JURY CLAIM

PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES SO TRIABLE

Respectfully submitted,

VINCENT E. STUART,

By his attorneys,


/s/ Seth J. Robbins
Seth J. Robbins (BBO # 655146)
srobbins@toddweld.com
Carole C. Cooke (BBO # 646000)
ccooke@toddweld.com
Hillary Lehmann (BBO # 683657)
hlehmann@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated:  December 20, 2016