UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VINCENT E. STUART, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * Civil Action No. 16-cv-12559-IT |
| | * |
| TOWN OF FRAMINGHAM and | * |
| BRIAN SIMONEAU, Assistant to the | * |
| Chief of Police of the Town of Framingham, | * |
| Individually, | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

March 20, 2018

TALWANI, D.J.

Pending before this court is Defendants City of Framingham and Brian Simoneau's Motion for Judgment on the Pleadings as to Counts I & II Pursuant to Rule 12(c) [#27]. Defendants move to dismiss Counts I and II of Plaintiff Vincent Stuart's First Amended Complaint [#20] for failure to state a claim upon which relief can be granted. For the reasons set forth below, Defendants' motion is DENIED.

I. Factual Background as Alleged by Plaintiff

In 2000, Plaintiff began working as a police officer at the Framingham Police Department ("FPD"). First. Am. Compl. ¶ 12. He was promoted to Police Sergeant in 2008, and to Police Lieutenant in 2014. Id. Prior to his suspension, Plaintiff was the Commanding Officer of the FPD's Weapons Training Unit for roughly 3.5 years. Id. ¶ 14. He was also the FPD's SWAT Team Leader, Tactical Operations Commander, liaison to the Massachusetts State Police STOP Team, and Shift Commander of the evening shift. Id. ¶¶ 13, 15-16.

Defendant Simoneau joined the FPD as a dispatcher in the 1990s. Id. ¶ 23. During his time as a dispatcher, Simoneau also attended the Massachusetts School of Law, passed the bar, and opened a private law practice. Id. ¶ 25. At some time in the 1990s, Simoneau was given the honorific title of "Special Police Officer" by former FPD Chief of Police Brent Larrabee. Id. ¶ 24. Under former FPD Chief of Police Steven Carl, Simoneau became the Assistant to the Chief and provided administrative assistance. Id. ¶ 27.

Plaintiff alleges that in 2013, around the time Chief Kenneth Ferguson became chief of the FPD, Simoneau's role and authority greatly increased. Id. ¶ 28. According to Plaintiff, Chief Ferguson gave Simoneau a gun (after a one-week basic firearms course for reserve officers), uniform, citation book, and police cruiser. Id. ¶ 29. Plaintiff raised concerns regarding Simoneau to Chief Ferguson on several occasions prior to April 2015. Id. ¶ 47. Around April 2015, Plaintiff informed Chief Ferguson that Simoneau had been conducting motor vehicle stops, responding to police calls, and appearing at active crime scenes, all without adequate screening, training, and experience, and that these actions were endangering the general public, compromising police investigations, and opening the FPD to significant legal liability. Id. ¶ 46. The specific instances which Plaintiff contends led to his April 2015 report included, but were not limited to:

1) Plaintiff alleges that on October 5, 2014, while driving his personal vehicle, Simoneau allegedly conducted a motor vehicle stop in which he allowed both occupants to exit the vehicle, allowed the passenger to walk away, and allowed the driver to return to the vehicle and spend several minutes looking for his license, "thereby committing multiple officer safety violations." Simoneau did not ask dispatch to send a marked unit, and he could not issue a citation because he did not have his citation book with him. Afterwards, back at the police station, Simoneau asked for the driver's record and learned that the driver had 26 entries including OUI and numerous drug offenses. Id. ¶ 48.

2) Plaintiff alleges that on November 11, 2014, while in his police cruiser, Simoneau allegedly stopped a vehicle for an illegal U-turn and issued a warning citation. Id.

Plaintiff alleges that Chief Ferguson stated that he would maintain the status quo and told Plaintiff to ignore Simoneau. Id. ¶ 49. Plaintiff continued to raise concerns to Chief Ferguson over the ensuing month. Id. ¶ 50. Plaintiff alleges that the specific instances which led to these further complaints included:

1) On April 22, 2015, Simoneau allegedly responded to a police call and interfered with an active crime scene involving a reported breaking and entering, in which two individuals who were possibly armed fled the scene. A perimeter was set up and tracking dogs deployed. Without informing anyone that he was in the area, Simoneau allegedly drove past or through the perimeter in his cruiser with blue lights at least 6-7 times. Id. ¶ 50.

2) On May 1, 2015, a radio call went out to Area A cars to respond to a fight on Hollis Street. Simoneau, without identifying himself, allegedly used the police radio to ask for clarification regarding the call and stated that there was "nothing showing yet" and advised units to "slow down, it's a simple domestic." Simoneau drove to the call location and when other officers arrived, Simoneau was standing outside of his vehicle, his gun visible while his badge was not. Id.

Chief Ferguson allegedly told Plaintiff to ignore Simoneau. Id. ¶ 51.

After multiple attempts to convince Chief Ferguson of the seriousness of the situation, Plaintiff brought his concerns to his union, the Framingham Police Superior Officers Association ("FPSOA"). Id. ¶ 52. In early June 2015, the FPSOA Executive Board sent a letter to Chief Ferguson detailing specific allegations regarding Simoneau's actions as a "Special Officer." Id. ¶ 53 & Ex. A [#1-3]. The letter continued:

> The incident in Tulsa[,] Oklahoma[,] in April, where a Part time Deputy[] shot and killed an individual was 100% preventable. Those that allowed him to operate as a "part-time" officer did so, knowing that he was not trained or qualified. Having that individual on the road has resulted in the death of one individual and long term law suits to come. The supervisors on that agency had long expressed their concerns regarding the part-time deputy's qualifications and training.
>
> Allowing Brian [Simoneau] to operate in this similar capacity, conducting motor vehicle stops, and responding to calls opens members of the Superior Officers Union to tremendous liability issues.
>
> . . .

3

> [T]his letter is being submitted out of professional concerns given the recent trends nationwide in policing; surrounding the issues of training, legitimacy and procedural justice.

Id. Ex. A. The letter concluded with the hope "that members of the FPSOA will not be retaliated against for addressing this public safety issue." Id. The letter was signed by the six-member FPSOA Executive Board, including Plaintiff, who was responsible for most of the contents of the letter. Id. ¶ 53. Plaintiff alleges on information and belief that Simoneau understood that Plaintiff had been the moving force behind, as well as the primary author of, the letter. Id.

Following these complaints, Simoneau allegedly began to target Plaintiff by executing a series of retaliatory actions against him. Id. ¶ 57. First, less than 2 weeks after the FPSOA letter, Simoneau convinced Chief Ferguson to shut down the Active Shooter/Patrol Rifle monthly training, which Plaintiff created and oversaw. Id. ¶ 58. Second, Simoneau changed the booking policy so that Shift Commanders, like Plaintiff, would be required to personally book and process all prisoners. Id. ¶ 60. Third, around August 2015, Simoneau conducted an allegedly unauthorized investigation into Plaintiff's work hours, including obtaining several months of video surveillance. Id. ¶ 62.

Around October 2015, Plaintiff, who was responsible for all firearms training, brought to Chief Ferguson concerns that one of Plaintiff's instructors had been teaching courses for roughly 8 years without proper certification and thereby collecting overtime pay for which he was not entitled, which was a criminal violation. Id. ¶ 73. In June 2016, an investigation was commenced into that officer's conduct and qualifications. Id. ¶ 76. Two months later, in August 2016, the investigation was re-directed towards Plaintiff. Id. ¶ 77. At the direction of Chief Ferguson, Plaintiff was made a subject of an Internal Administrative Investigation as to whether he had

knowingly put false information into his complaint, and was given a Notice of Suspension, placed on administrative leave, and relieved of his duties. Id. ¶¶ 78-79.

Simoneau allegedly was involved in the investigation of Plaintiff. Id. ¶ 83. Although Simoneau did not conduct the formal investigation interviews of Plaintiff, Simoneau drafted the questions asked during the interview. Id. ¶ 84. Furthermore, Simoneau participated in drafting the report regarding the investigation into Plaintiff. Id. ¶ 85-86. Although Plaintiff was found not to have knowingly filed a false complaint, the report falsely concluded that Plaintiff included subsidiary untrue statements in his complaint. Id. ¶¶ 87-88.

In February 2017, the FPD sent a Notice of Discharge terminating Plaintiff. Id. ¶ 94.

## II. Discussion

### A. *Standard of Review*

Where "a motion for judgment on the pleadings 'is employed as a vehicle to test the plausibility of a complaint, it must be evaluated as if it were a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).'" Shay v. Walters, 702 F.3d 76, 82 (1st Cir. 2012). In evaluating a motion to dismiss, the court assumes "the truth of all well-pleaded facts" and draws "all reasonable inferences in the plaintiff's favor." Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). To survive dismissal, a complaint must contain sufficient factual material "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007)).

In deciding such a motion, a court is ordinarily limited to considering "only the complaint, documents attached to it, and documents expressly incorporated into it." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 72 (1st Cir. 2014). When, however, "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the

authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . [f]actual allegations must be enough to raise a right to relief above the speculative level . . ." Twombly, 550 U.S. at 555 (internal citations and quotations omitted). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663.

      B.      *42 U.S.C. § 1983 Claim against Defendant Simoneau (Count I)*

To "state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States[,] and (2) that the perpetrator of the violation was acting under color of law." Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 621 (1st Cir. 2000). Plaintiff alleges a violation of his federal civil right to free speech, protected under the First Amendment of the United States Constitution, by Defendant Brian Simoneau, a FPD employee. First Am. Compl. ¶¶ 1, 97.

To determine whether an adverse employment action against a public employee violates a First Amendment right, the First Circuit has articulated a three-part inquiry: (1) whether the employee spoke as a citizen on a matter of public concern, (2) whether the employee's interest in commenting on these matters outweighed the defendant's interest in the efficient performance of its public service, and (3) whether the protected expression was a substantial or motivating factor in the adverse employment action. Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011). Under prong one, Plaintiff must show that his "speech touched upon a matter of public concern" and that he spoke as a citizen rather than as an employee. Id. at 30. Defendants argue that Count I

must be dismissed because, under prong one, Plaintiff was not speaking as a citizen but in his capacity as a FPD Lieutenant.[1]

The First Circuit has underscored the importance of a "two-step, context-specific inquiry" to determine whether an individual was speaking as a citizen or an employee. Id. at 31. First, the court asks what the employee's official responsibilities are. "[T]he proper inquiry is 'practical' rather than formal, focusing on 'the duties an employee actually is expected perform,' and not merely those formally listed in the employee's job description." Id. (quoting Garcetti et. al. v. Ceballos, 126 S. Ct. 1951, 1961-1962 (2006)). Here, Plaintiff alleges that at the time of the events at issue, he was a Lieutenant, the Commanding Officer of the FPD's Weapons Training Unit, the FPD's SWAT Team Leader, Tactical Operations Commander, liaison to the Massachusetts State Police STOP Team, and Shift Commander of the evening shift. Id. ¶¶ 13, 15-16. He does not identify his specific duties in the First Amended Complaint, but does allege that his responsibilities included reporting fellow police personnel who have violated rules and regulations or placed others in danger. Id. ¶ 21; see also id. ¶ 74 ("[u]nder the FPD Policy of Professional Standards & Internal Affairs 10-1, Lt. Stuart was obligated to report [Simoneau's actions].").

Defendants argue that this responsibility makes the speech here pursuant to Plaintiff's duties. Plaintiff responds that he had no specific duty arising from any of his job positions to report FPD employees that were not under his direct command and supervision, and that Defendant Simoneau was not Plaintiff's subordinate. In Garcetti, the Supreme Court rejected

---

[1] Defendants' Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings as Counts I & II Pursuant to 12(c) [#28] does not challenge prongs two and three. At the hearing, Defendants' counsel did not dispute, for purposes of the motion to dismiss, that Plaintiff's speech concerned a matter of public concern under prong one.

"the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions" and noted that "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." 547 U.S. at 424-425. Generalized reporting duties would similarly not seem to justify restrictions on employee rights. See Taylor v. Town of Freetown, 479 F. Supp. 2d 227, 237 (D. Mass. 2007) ("Garcetti is not meant to strip an employee of First Amendment protection when speaking out regarding issues of serious and widespread public concern . . . just because a garden-variety rule requires him to tell a supervisor."). The court concludes that Plaintiff's generalized duty to report wrongdoing does not make reporting of Simoneau's conduct one of Plaintiff's job duties.

Assuming that Plaintiff did have such a duty, the court must still determine whether the speech at issue was made "pursuant to those responsibilities." Decotiis, 635 F.3d at 33. Here, the court "must take a hard look at the context of the speech," and consider various contextual factors, though no one factor is dispositive. Id. at 32. Defendants argue that factors identified in Decotiis for evaluating that context show that Plaintiff's speech was nothing more than internal reporting done pursuant to official duties as a government employee. Although Defendants' argument has some persuasive force with regard to the initial verbal reports by Plaintiff to the Chief of Police, Defendants' argument fails with respect to the June 5, 2015, letter.

One contextual factor identified in Decotiis is "whether the employee was commissioned or paid to make the speech in question." Id. (citing Garcetti, 547 U.S. at 421). Plaintiff alleges that he was responsible for most of the content of the letter, and that the letter was signed by his union's Executive Board, including Plaintiff. Based on these allegations, the letter in question was not paid or commissioned by Plaintiff's employer.

8

A second contextual factor is "whether the speech was made up the chain of command." Id. (citing Garcetti, 547 U.S. at 420). Although Plaintiff's initial complaints were made internally, see First Am. Compl. ¶¶ 46- 51, the letter sent by the union was not internal speech given "up the chain of command."

Another contextual factor is "whether the speech gave objective observers the impression that the employee represented the employer when [the employee] spoke (lending it 'official significance')." Decotiis, 635 F.3d at 32 (quoting Foley v. Town of Randolph, 598 F.3d 1, 7-8 & n. 9 (1st Cir. 2010)). Here, even Plaintiff's verbal complaints regarding the matter were directly contrary to Chief Ferguson's alleged statements to ignore Simoneau's actions, id. ¶¶ 49, 51, and thus would not give an observer the impression that Plaintiff was representing his employer when he spoke. In any event, the letter from the union could in no way be viewed as speech made representing Plaintiff's employer.

A further contextual factor is "whether there is a so-called citizen analogue to the speech." Decotiis, 635 F.3d at 32. While there may be no citizen analogue to the verbal complaints made by Plaintiff to Chief Ferguson, a letter from the union to the Chief of Police is analogous to a letter from a citizen to the Chief of Police.

Two other contextual factors identified in Decotiis—"the subject matter of the speech" and "whether the employee's speech derived from special knowledge obtained during the course of [the employee's] employment," id.,—tie directly to Plaintiff's employment. But the mere fact that an individual's speech "relates to public employment" or "concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." Lane v. Franks, 134 S. Ct. 2369, 2379 (2014). Indeed, "'[g]overnment employees are often in the best position to know what ails the agencies for which they work,'"

and there is "considerable value . . . in encouraging, rather than inhibiting, speech by public employees." Id. at 2377 (quoting Waters v. Churchill, 511 U.S. 661, 674 (1994) (plurality opinion)). The Supreme Court has thus repeatedly recognized that "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through the employment." Id. at 2379 (citing Garcetti, 547 U.S. at 421; San Diego v. Roe, 543 U.S. 77, 80 (2004); Pickering v. Bd of Educ. of Twp. High Sch. Dist. 205, Will Cty., 391 U.S. 563, 568 (1968)). The First Circuit in Decotiis noted that no one contextual factors is dispositive, and the court finds here that these two factors are nondispositive.

In sum, even if Plaintiff could be viewed as having a duty to report Simoneau's conduct and even if the letter concerned information acquired by virtue of Plaintiff's employment, this court cannot conclude based on the allegations in the First Amended Complaint that Plaintiff's letter was unprotected speech made pursuant to his job responsibilities, rather than protected citizen speech, informed by Plaintiff's knowledge as a government employee. Accordingly, Count I of Defendants' Motion for Judgment on the Pleadings as to Counts I & II Pursuant to Rule 12(c) [#27] is DENIED.

*C.  42 U.S.C. § 1983 Claim against Defendant Town of Framingham (Count II)*

In order for a municipality to be held liable for civil rights violations under 42 U.S.C. § 1983, a plaintiff must show that "the municipality itself cause[d] the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under §1983." City of Canton v. Harris, 489 U.S. 378, 387 (1989). A municipality can be seen as having caused a constitutional violation "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

10

injury." Monell v. Dept. of Soc. Servs., 436 U.S. 658, 694 (1978). There are two theories upon which municipal liability may be premised. The plaintiff must show either: 1) the existence of a policy or custom "so persistent and widespread as to practically have the force of law," Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011); or 2) "that a person with final policy making authority caused the supposed constitutional injury." Rodriguez v. Municipality of San Juan, 659, F.3d 168, 181 (1st Cir. 2011) (internal citations and quotations omitted). "A single decision by a municipal policymaker constitutes official policy 'only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)).

Defendants argue that Plaintiff cannot demonstrate municipal liability under the second prong because Chief Ferguson is not the "policymaker" with final authority to terminate Plaintiff. Defendants argue that such authority lies with the Civil Service Commission. The court need not resolve this issue as Defendants concede that the police chief does have the final authority to discipline and place police officers on administrative leave. In addition to his termination, Plaintiff also alleges that he was placed on administrative leave at the direction of the police chief, and that the administrative leave is also the basis for his municipal liability claim. First Am. Compl. ¶¶ 78, 105. At the motion to dismiss stage, Plaintiff has sufficiently pled municipal liability under §1983.[2] Accordingly, Count II of Defendants' Motion for Judgment on the Pleadings as to Counts I & II Pursuant to Rule 12(c) [#27] is DENIED.

---

[2] Defendants also challenge Plaintiff's contention that municipal liability may attach here based on a widespread policy or custom. Because Plaintiff's First Amended Complaint survives under the second prong, the court need not determine whether Plaintiff's allegations of prior retaliation against employees who reported FPD misconduct to the FBI and against employees engaged in union activities, First Am. Compl. ¶ 93, would be sufficient on their own.

11

III. Conclusion

For the foregoing reasons, and as set forth above, the Motion for Judgment on the Pleadings as to Counts I & II Pursuant to Rule 12(c) [#27] is DENIED.

IT IS SO ORDERED.


Date: March 20, 2018                    /s/ Indira Talwani
                                        United States District Judge