UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VINCENT E. STUART, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:16-cv-12559-IT |
| | * | |
| CITY OF FRAMINGHAM and | * | |
| BRIAN SIMONEAU, Assistant to the | * | |
| Chief of Police, individually, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM & ORDER

January 22, 2020

I.      Introduction

Plaintiff Vincent Stuart, a former Lieutenant with the Framingham Police Department,

filed this suit against Defendants Town of Framingham[1] and Brian Simoneau, Assistant to the

Chief of Police, in his individual capacity. Stuart alleges that he was terminated from his position

at the Framingham Police Department in retaliation for reporting misconduct, in violation of

federal civil rights laws and the Massachusetts Public Employee Whistleblowing Statute, M.G.L.

c. 149, § 185. Stuart also alleges several contract claims against Defendants.

The facts presented in the opposition to the pending motions for summary judgment

reflect troubling interactions between members of the Framingham Police Department.

Nonetheless, a reasonable jury could not find that any protected speech was a substantial and

motivating factor for the adverse employment actions. Accordingly, for reasons discussed below,

---

[1] Framingham changed to a City form of government, effective January 1, 2018, Notice of Name
Change [#83], and pleadings after that date have been filed on behalf of the City of Framingham,
but under the original caption.

the court GRANTS Framingham's <u>Motion for Summary Judgment</u> [#175] and Simoneau's

<u>Motion for Summary Judgment</u> [#177].

II.      <u>Facts & Procedural Background</u>

Unless stated otherwise, the following facts are undisputed for purposes of these motions.

A.      *Background*

Stuart joined the Framingham Police Department ("FPD") in July 2000 and was

appointed to Lieutenant in 2014. Plaintiff's Revised Response to Defendants' Revised Statement

of Material Facts ¶ 1 ("Pl.'s Revised Resp. to Defs.' SOF") [#205]; Defs.' Ex. A 52:17-22

("Defs.' Ex., Stuart Dep.") [#179-1]. As Lieutenant, Stuart served as a Shift Commander for the

evening shift and was responsible for managing the shift, including supervising the booking

process. Pl.'s Revised Resp. to Defs.' SOF ¶¶ 2, 168 [#205]; Defs.' Ex. I ¶ 40 ("Job Description,

Commanding Officer Patrol Division") [#179-9]. Stuart also served as the Commanding Officer

of the FPD's Weapons Training Unit. Pl.'s Ex. 1 ¶ 5 ("Stuart Aff.") [#207-1].

Stuart was a member of the Framingham Police Superior Officers Association ("Union")

and was a member of its Executive Board. Pl.'s Revised Resp. to Defs.' SOF ¶ 3 [#205].

In 2001, then-Chief Steven Carl appointed Simoneau as Assistant to the Chief. Pl.'s

Revised Resp. to Defs.' SOF ¶ 4 [#205]. Simoneau, who is also an attorney, provides advice to

the Chief on civil service law and personnel issues, and is in charge of the time and attendance

for the department. Pl.'s Revised Resp. to Defs.' SOF ¶¶ 4-6 [#205]; Defs.' Ex. C 72:21-24

("Trask Dep.") [#179-3]. Simoneau holds no rank as a civilian employee and does not supervise

other employees. Pl.'s Revised Resp. to Defs.' SOF ¶¶ 6, 41 [#205]; Trask Dep. 73:1-7 [#179-3].

B.      *Stuart's Complaints*

In or around April and May of 2015, Stuart verbally complained to Chief Kenneth

Ferguson about Simoneau and his role in the FPD. Stuart Aff. ¶¶ 21-26 [#207-1]. Stuart

expressed concerns that Simoneau had been conducting motor vehicle stops, responding to police calls, and appearing at active crime scenes without the necessary screening, training and experience, including firearms training. Id.

Stuart also brought his concerns about Simoneau to the Union, and on June 5, 2015, the Union's Executive Board addressed a letter ("Union Letter") to Chief Ferguson regarding Simoneau. Pl.'s Revised Resp. to Defs.' SOF ¶ 18 [#205]; Stuart Aff. ¶ 30 [#207-1]; Defs.' Ex. L 3 ("Union Letter") [#179-12]. The letter listed incidents where the Union alleged Simoneau had behaved improperly and expressed the concern that "[a]llowing [Simoneau] to operate in this similar capacity . . . opens members of the Superior Officers Union to tremendous liability issues." Pl.'s Revised Resp. to Defs.' SOF ¶ 23 [#205]. The letter also noted that "it was agreed that . . . Simoneau would no longer be acting in any Special Officer capacity," and asked Chief Ferguson to "confirm this resolution, in written format, with a letter from your office affirming the same." Union Letter 3 [#179-12]. Within two days of the letter's delivery, Simoneau knew about the letter, and of Stuart's involvement in drafting the letter. Pl.'s Revised Resp. to Defs.' SOF ¶ 46 [#205]; Pl.'s Ex. 20 ¶¶ 6-7 ("Brown Aff.") [#207-20].

After Stuart complained to Chief Ferguson, Simoneau participated in a firearms certification training class, which Stuart assisted him in finding. Pl.'s Revised Resp. to Defs.' SOF ¶ 25 [#205]; Stuart Aff. ¶ 29 [#207-1]; Defs.' Ex. B ("Simoneau Dep.") 414:3-15 [#179-2].

C.      *Subsequent Changes to the Rifle Team and Booking Policy*

Stuart was involved in the FPD's Active Shooter/Patrol Rifle monthly training team, which offered supplemental firearms training to officers. Pl.'s Revised Resp. to Defs.' SOF ¶ 161 [#205]. The FPD gave members of the rifle team time owed every time they went to a training. Id. ¶ 162. Around mid-June 2015, Chief Ferguson shut down this team. Id. ¶ 165. Prior to Ferguson shutting down the rifle team, other supervisors had complained to Ferguson about

the resources used in the rifle team. Id. ¶ 162. Chief Ferguson stated that Ferguson shut down the

rifle team due to a lack of resources to continue the program. Id. ¶ 165 [#205]; Defs.' Ex., Stuart

Dep. 358:5-18 [#179-1].

By an email dated July 28, 2015, Ferguson announced an update to the FPD Policy on

Booking. Pl.'s Revised Resp. to Defs.' SOF ¶ 169 [#205]; Defs.' Ex. XX ("Ferguson Email")

[#179-50]. The email said that "the Shift Commander shall personally book and process all

prisoners, unless the performance of some supervisory function prevents him or her from doing

so. In such cases, the Shift Commander shall personally review the booking and notify the

Deputy Chief of Operations via e-mail as to why he or she was unable to personally perform the

booking." Ferguson Email [#179-50]. The change in policy came after Simoneau reviewed data

relating to Stuart's booking of prisoners and found that Stuart had personally booked less than

7% of the bookings that occurred during his shift. Pl.'s Revised Resp. to Defs.' SOF ¶ 171

[#205]; Defs.' Resp. to Pl.'s SAMF ¶ 46 [#210]; Defs.' Ex. YY ("Spreadsheet of Bookings")

[#179-51]. Simoneau subsequently drafted the new policy and initiated the policy change,

although Ferguson was the one to institute the new booking policy. Kenneth Ferguson

Deposition ("Ferguson Dep.") 518:3-20 [#179-4]. Stuart reports that the policy was unpopular

among other Shift Commanders, who nicknamed it "the Stuart Policy." Defs.' Resp. to Pl.'s

SAMF ¶ 47 [#210]; Pl.'s Ex. 31 376:4-377:16 ("Pl.'s Ex., Stuart Dep.") [#207-31].

In December 9, 2015, Stuart entered into a settlement agreement with Framingham and

the Union to resolve an investigation relating to Stuart's use of flexible work time, and

Simoneau's involvement in that investigation. Defs.' Ex. WW ("Settlement Agreement") [#179-

49]. Stuart affirmed that as of that date, he had not been retaliated against for reporting or

cooperating in any investigations of any allegations of wrongdoing or inappropriate conduct by

Framingham. Id. 4.[2]

> D.      *Stuart's Complaint Against Lt. Downing*

Several years prior to the events at issue, another Lieutenant, Robert Downing, excluded

Stuart's daughter from a softball league that Downing managed. Pl.'s Revised Resp. to Defs.'

SOF ¶ 72 [#205]; Defs.' Ex., Stuart Dep. 179:1-24; 191:2-192:24 [#179-1]. In late April 2016,

Downing spoke with FPD Detectives about an investigation of Stuart's daughter after she was

involved in an altercation with a school classmate. Pl.'s Revised Resp. to Defs.' SOF ¶ 73

[#205]. Stuart emailed himself the investigative report concerning this altercation. Id. ¶ 74.

Three weeks after sending these emails, on May 26, 2016, Stuart delivered a complaint

about Downing to Dolores Hamilton ("Hamilton"), Framingham's Human Resources Director.

Stuart Aff. ¶¶ 102 [#207-1]; Pl.'s Revised Resp. to Defs.' SOF ¶ 80 [#205]; Defs. Ex. FF 6

("Downing Complaint")) [#179-32]. Stuart delivered the complaint to Hamilton rather than to

someone at the FPD because Stuart did not trust that "an investigation of [his] . . . complaint as

to Downing would be treated fairly . . . ." Stuart Aff. ¶¶ 99-102 [#207-1]. In this complaint,

Stuart accused Downing of multiple counts of larceny over $250, and reports of forgery or

uttering false overtime reports, fraud, untruthfulness, and conduct unbecoming to a police

lieutenant. Downing Complaint [#179-32]. Stuart also asserted that Downing's CTS-Less Lethal

Impact Munitions Instructor status had expired in April 2006. Id.

---

[2] Both parties seek to develop facts relating to the investigation conducted by Simoneau into
Stuart's hours at work and whether Stuart was absenting himself from work without taking time
off. Defs.' Resp. to Pl.'s SAMF ¶¶ 48-56 [#210]; Pl.'s Resp. to Defs.' SOF ¶¶ 129-155 [#205].
In light of the Settlement Agreement, the court does not address this investigation as a potential
adverse action.

In his Affidavit, Stuart stated that he had been looking into Downing intermittently since at least October 2014. Stuart Aff. ¶¶ 53-59 [#207-1]. Ten days after submitting the Downing Complaint, Stuart contacted Chief Ferguson to ensure that Simoneau would not be involved in any investigation into the claims Stuart had raised about Downing. Defs.' Resp. to Pl.'s SAMF ¶ 95 [#210]; Stuart Aff. ¶¶ 98, 103 [#207-1]. Ferguson assured Stuart that Simoneau would not "be involved in anything involving [Stuart] anymore." Stuart Aff. ¶¶ 98-100, 103, 116 [#207-1].

E.      *Stuart's Suspension and Termination*

Two months later, on August 8, 2016, Deputy Chief Ronald Brandolini ("Brandolini") handed Stuart a Notice of Investigation and a Notice of Suspension of Police Powers/Placement on Paid Administrative Leave. Defs.' Revised Resp. to Pl.'s SAMF ¶ 122 [#210]; Pl.'s Ex. 80 ("Notice of Placement on Paid Administrative Leave") [#207-80]; Pl.'s Ex. 79 ("Notice of Investigation") [#207-79]. Pursuant to the Notice of Investigation, Brandolini "was conducting an investigation" regarding Stuart's recently submitted Downing Complaint, which alleged that Downing committed "various felonies and misdemeanors." Notice of Investigation 1 [#207-79]. Under the terms of the Notice of Placement on Paid Administrative Leave, Stuart was suspended with pay and administratively relieved from his duties at the FPD, and ordered to turn in his weapons, and "any other Police Department records and/or property in [his] possession." Id. The Notice of Placement on Paid Administrative Leave also ordered Stuart not to enter the non-public areas, and stated that Stuart was being placed on leave pending an investigation. Id.

The FPD has a Policy on Professional Standards and Internal Affairs 10-1 ("IA Policy"), adopted and implemented in 2003, which expresses the principles governing a Professional Standards/Internal Affairs investigation—to ensure that investigations and fair and impartial—as well as the roles and responsibilities of the investigative officer. Pl.'s Ex. 21 ("IA Policy 10-1") [#207-21]; Defs.' Resp. to Pl.'s SAMF ¶ 12 [#210].

Brandolini completed an investigative report on September 30, 2016. Pl.'s Revised Resp. to Defs.' SOF ¶ 101 [#205]; Defs.' Ex. JJ ("Internal Investigative Report") [#179-36]. This Internal Investigative Report concluded that Stuart had been untruthful in the Downing Complaint, but did not recommend any specific disciplinary action against Stuart. Pl.'s Revised Resp. to Defs.' SOF ¶ 103 [#205]; Internal Investigative Report 25 [#179-36].

On January 31, 2017, Framingham Hearing Officer John Collins held a disciplinary hearing on the issues expressed in the Internal Investigative Report. Pl.'s Revised Resp. to Defs.' SOF ¶ 116 [#205]. At the hearing, Framingham and Stuart were represented by legal counsel. Id. Stuart did not testify at the hearing. Id. ¶ 115. The Hearing Officer subsequently prepared a report outlining his findings. Id. ¶ 117; Defs.' Ex. KK ("Report of Hearing Officer") [#179-37]. According to the Hearing Officer, his "assignment was limited to determining whether there was just cause to discipline Lt. Stuart based on charges that resulted from the Deputy [Chief]'s investigation." Report of Hearing Officer 5 [#179-37]. The Hearing Officer found that Stuart filed a false report and made untruthful statements when he submitted the Downing Complaint. Id. 7-8. Specifically, the Hearing Officer found that Stuart (1) violated FPD Rule 4.3 by "incompetently claiming" that Downing's actions contained the required elements of the crimes of which Stuart accused Downing; (2) violated FPD Rule 10.1 and 10.2 by filing false reports; (3) violated FPD Rule 4.7 by lying during the Internal Affairs Investigation; (4) and exhibited "Conduct Unbecoming a Police Officer" by bringing the department into disrepute when he distributed copies of the Downing Complaint. Id. 8 [#179-37]. With respect to discipline, the Hearing Officer noted that the specific violation of Rule 4.7 (Truthfulness) "implicate[] the Brady/Giglio standards making the Lieutenant 'damaged goods,' unable to perform essential job duties including testifying credibly in court or other forums, and requiring termination." Id. 27.

Acting Chief Trask adopted the Hearing Officer's recommendation and terminated

Stuart's employment on February 22, 2017. Pl.'s Revised Resp. to Defs.' SOF ¶ 121 [#205];

Defs.' Ex. LL (Discharge Notice) [#179-38].

    F.    *The Collective Bargaining Agreement*

During the relevant period of 2013 through Stuart's termination in 2017, the terms and

conditions of Stuart's employment were governed by a Collective Bargaining Agreement

("CBA") between Framingham and the Union. Pl.'s Revised Resp. to Defs.' SOF ¶ 129 [#205];

Defs.' Ex. O ¶¶ 18-19 ("Simoneau Aff.") [#179-15]; Ex. A to Simoneau Aff. ("CBA") [#179-

15]. Under the CBA, "[n]o employee shall be reprimanded, suspended, discharged or otherwise

disciplined except for just cause," which shall be "interpreted consistent with G.L. c. 31." CBA 2

[#179-15].

Article V of the CBA describes the Grievance Procedure for resolving disputes arising

out of alleged violations of the CBA. Id. 2-3. The step-based procedure, if initiated, allows for

grievances to be submitted orally, followed by a submission in writing, and then through a

submission to the Town Manager. Id. If the grievance is not resolved at any of these steps,

Framingham or the Union may submit the grievance to arbitration. Id. 3.

Neither Stuart nor the Union filed a grievance concerning his termination. Pl.'s Revised

Resp. to Defs.' SOF ¶ 114 [#205]. Stuart also did not appeal his termination from FPD to the

Civil Service Commission. Id. ¶ 126.

    G.    *The Claims in this Case*

The First Amended Complaint [#20] alleges four counts against Framingham and three

counts against Simoneau, in his individual capacity. Count I and II assert retaliation under 42

U.S.C. § 1983 against Simoneau and Framingham, respectively. Stuart also alleges that

Framingham violated M.G.L. c. 149, § 185(b)(1) (Count III), that the IA Policy is a contract that

Framingham breached by failing to conduct a fair or impartial investigation (Count IV), and that

Framingham breached the implied covenant of good faith and fair dealing in its handling of

Stuart's termination (Count V). Stuart further asserts that Simoneau intentionally interfered with

Stuart's contractual relationship with Framingham (Count VI) and that Simoneau unlawfully

interfered with Stuart's advantageous business with relationship with Framingham (Count VII).

III.     Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury

could resolve the point in favor of the non-moving party." Baker v. St. Paul Travelers, Inc., 670

F.3d 119, 125 (1st Cir. 2012) (quoting Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir.

2009)). "A fact is 'material' if it has the potential of determining the outcome of the litigation."

Id.

When reviewing a motion for summary judgment, the court must take all properly

supported evidence in the light most favorable to the nonmovant and draw all reasonable

inferences in the nonmovant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). In

so doing, the court properly "give[s] no heed to speculative, unsupported, or unreasonable

conclusions." Showtime Entm't, LLC v. Town of Mendon, 769 F.3d 61, 69 (1st Cir. 2014).

IV.     Defendants' Motions for Summary Judgment

A.     *Claims Brought Under 42 U.S.C. § 1983*

To assert a claim for retaliation under 42 U.S.C. § 1983, a public-sector employee must

show that he was speaking as a citizen and that his "speech was on a matter of public concern."

Delaney v. Town of Abington, 890 F.3d 1, 5 (1st Cir. 2018) (quoting Curran v. Cousins, 509

F.3d 36, 45 (1st Cir. 2007)). The employee must also demonstrate that the "protected expression

9

was a substantial or motivating factor in the adverse employment decision." <u>Delaney</u>, 890 F.3d at

5 (quoting <u>Curran</u>, 509 F.3d at 45). However, even if the plaintiff succeeds on those three

factors, the defendant may prevail by showing "that [the employer] would have reached the same

decision even absent the protected conduct." <u>Decotiis v. Whittemore</u>, 635 F.3d 22, 30 (citing <u>Mt.</u>

<u>Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287 (1977)); <u>see also</u> <u>Rodriguez-</u>

<u>Garcia v. Miranda-Marin</u>, 610 F.3d 756, 765-66 (1st Cir. 2010) ("[T]he employer may avoid

liability by showing that it would have reached the same decision even absent the protected

conduct. This is the so-called <u>Mt. Healthy</u> defense.").

       1.   <u>Did Stuart Engage in Protected Speech?</u>

Stuart asserts that he engaged in protected speech by making verbal complaints to

Ferguson regarding Simoneau in or around April 2015, and in drafting the Union Letter

regarding Simoneau's role in the Department. Pl.'s Resp. to Defs.' SOF ¶¶ 22-24 [#205].

To assert that speech is protected, as a threshold matter, a plaintiff must first show that he

"spoke as a citizen" and that his "speech was on a matter of public concern." <u>Delaney</u>, 890 F.3d

at 5 (quoting <u>Curran</u>, 509 F.3d at 45 (1st Cir. 2007)); <u>see</u> <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418

(2006) ("[T]he possibility of a First Amendment claim arises" when "the employee spoke as a

citizen on a matter of public concern"). "Where speech relates to a matter of inherent public

concern, such as official malfeasance or the neglect of duties, this inquiry is confined to the

subject matter of the speech." <u>Decotiis</u>, 635 F.3d at 30. In determining whether speech was made

pursuant to official duties, courts consider non-exclusive and context-specific factors including

whether the employee was commissioned or paid to make the speech, the subject matter of the

speech, whether the speech was made up the chain of command, and whether there is a citizen

analogue to the speech. <u>Id.</u> at 32.

Here, a reasonable jury could find that Stuart's complaints, made both verbally and through the Union letter, related to matters of public concern, because they raised issues such as "official malfeasance, abuse of office, and neglect of duties." Curran, 509 F.3d at 46.

The court next considers whether, under Garcetti, Stuart's speech was made in his capacity as a private citizen. 547 U.S. at 421-22. "[T]he proper inquiry is 'practical' rather than formal, focusing on the 'duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description," and considers the context of the speech as well as the function of the plaintiff. Decotiis, 635 F.3d at 31 (quoting Garcetti, 547 U.S. at 424-25). Although Defendants assert that Stuart's complaints were made in the scope of his employment, a jury could find that Stuart was not acting in the scope of his official duties when he raised his concerns about Simoneau. See id. at 33 ("Nothing in Garcetti or the decisions interpreting it can fairly be read to suggest that all speech tangentially or broadly relating to the work of a public employee is per se unprotected."). Although there is evidence in the record that Stuart had some supervisory responsibilities, Defendants have not proffered evidence from which a jury could conclude that Stuart's duties included oversight over the role of the assistant to the Chief, or that his responsibilities involved reviewing for misconduct outside of officers in his command. Stuart Aff. ¶¶ 9-12 [#207-1]; cf. Garcetti, 547 U.S. at 421 (holding that the "controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy.").

Defendants also assert that the Union Letter cannot qualify as protected speech under a First Amendment retaliation claim, because the Letter came from the Union rather than Stuart personally. On summary judgment, the court rejects this argument as the record includes evidence that Defendants had knowledge of Stuart's role in drafting the Union letter.

11

2.   Was Stuart Subject to an Adverse Employment Action?

An action constitutes an adverse employment action for the purpose of a First

Amendment retaliation claim when "an employer's acts, viewed objectively, . . . would have a

chilling effect on the employee's exercise of First Amendment rights." Barton v. Clancy, 632

F.3d 9, 29 (1st Cir. 2011); see also Coszalter v. City of Salem, 320 F.3d 968, 975 (9th Cir. 2003)

(internal citation omitted) ("Various kinds of employment actions may have an impermissible

chilling effect. Depending on the circumstances, even minor acts of retaliation can infringe on an

employee's First Amendment rights."). Although "relatively minor events can give rise to § 1983

liability," the harassment must not be so "trivial that it would not deter an ordinary employee in

the exercise of his or her First Amendment rights." Barton, 632 F.3d at 29 (internal citations

omitted).

Defendants do not dispute that Stuart's termination constitutes an adverse action. Stuart

has also presented facts from which a jury could find that his placement on paid administrative

leave is an adverse action because it "would have a chilling effect on [his] exercise of First

Amendment rights." Id. As part of his placement on paid administrative leave, Stuart's badge

and department-issued weapons were removed, and his access to non-public areas of the FPD

was revoked. Notice of Placement on Paid Administrative Leave [#207-80]. A jury could find

that the social impact of and restrictions imposed by his placement on leave could deter a

reasonable person from exercising First Amendment rights. See Barton, 632 F.3d at 29

("[R]etaliatory harassment . . . including denial of special benefits and assignments, was

sufficiently adverse to form basis for First Amendment claim). [3]

---

[3] Stuart also asserts that he experienced an adverse employment action when Simoneau began
investigating his timekeeping without authorization. Am. Compl. ¶ 62 [#20]. Stuart explicitly
waived claims relating to this investigation, however, in the Settlement Agreement. Settlement
Agreement 2-3 [#179-49]. Stuart asserts further that he experienced an adverse employment

       3.   Was Stuart's Protected Speech a Substantial and Motivating Factor in
           Defendants' Imposition of an Adverse Action?

In the First Amendment retaliation context, the causation element may be established

through direct or circumstantial evidence, and the plaintiff must provide facts "linking his

employer's adverse employment actions to his protected conduct." McGunigle v. City of Quincy,

835 F.3d 192, 203 (1st Cir. 2016). Evidence that the alleged retaliator had knowledge of the

protected speech prior to the adverse action can be probative of causality, Delaney, 890 F.3d at 7,

while a gap of time can undermine the link between the protected conduct and the retaliatory act.

McGunigle, 835 F.3d at 204; see also Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 17 (1st Cir.

2011) ("In order to raise an inference of causation, temporal proximity must be close.") (internal

citations omitted). Evidence that the plaintiff violated regulations or policies that would normally

merit sanctions can show that the alleged retaliator would have imposed the same adverse

consequence even absent the protected speech. Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121,

131 (1st Cir. 2004). Here, Stuart has failed to show the causation element because he has not

raised facts that would allow a jury to find that Stuart's "protected expression was a substantial

---

action prior to the timekeeping investigation when Framingham shut down the rifle team that he
had organized and changed FPD's booking policy in a way that negatively impacted him. Am.
Compl. ¶¶ 58, 60, 62 [#20]. The question of whether changes to the rifle team and Booking
Policy amount to adverse actions is a close call. "The standard for showing an adverse
employment action is lower in the First Amendment retaliation context than it is in other
contexts (such as Title VII [discrimination claims]) . . . ." Rivera-Jimenez v. Pierluisi, 362 F.3d
87, 94 (1st Cir. 2004) (internal citations omitted), and "there is no requirement in the § 1983
context that a plaintiff show an "alteration in the material terms or conditions of his
employment." Barton, 632 F.3d at 29 (internal citation omitted). That said, in light of Stuart's
acknowledgement in the December 2015 settlement agreement that he had not been retaliated
against as of that date for reporting or cooperating in any investigations of any allegations of
wrongdoing or inappropriate conduct by Framingham, Settlement Agreement 4 [#179-49], and in
the absence of evidence supporting the claim that the changes to the rifle team or to the FPD's
booking policy would deter an ordinary person from exercising his First Amendment rights, the
court finds the summary judgment record does not contain sufficient evidence from which a jury
could conclude that these two actions amounted to adverse actions.

or motivating factor in the adverse employment decision" with respect to claims against

Framingham or Simoneau. Delaney, 890 F.3d at 5 (quoting Curran, 509 F.3d at 45).

i.       *Claims Against Framingham*

Stuart asserts that animus or pretext may be shown by Framingham's departure from its

normal practices by involving Simoneau in the investigation into Stuart and imposing a harsher

punishment than other officers who were disciplined for untruthfulness. See, e.g., Pl.'s SAMF

¶¶ 24-26, 101 [#206] (identifying other individuals who were investigated for untruthfulness;

stating that Simoneau was involved in investigating Stuart). Framingham denies having a

retaliatory animus, and instead identifies Stuart's conduct as the sole impetus for termination.

Framingham also asserts that because the termination occurred over a year after the protected

speech, there is insufficient temporal proximity between the protected speech and the termination

such that Stuart's speech could be considered a substantial and motivating factor in his

termination. Framingham Mem. 5-6 [#203].

Although Stuart identifies several individuals as possible comparators, Stuart has failed to

proffer information from which a jury could infer the individuals were similarly situated to

Stuart.[4] Stuart identifies Detective Matthew Gutwill as a comparator, but the underlying facts of

Gutwill's case are distinct[5]; while Detective Gutwill was disciplined for denying during an

investigation statements he allegedly made during an emotionally-charged private phone call

with the Chief, Stuart was disciplined for making a false formal complaint about another officer.

---

[4] Stuart relies upon Chief Ferguson's deposition testimony to identify other individuals who were
terminated or were found to be untruthful. Of the officers identified in Chief Ferguson's
testimony, only a few were involved in employment actions relating to allegations of
untruthfulness. However, with respect to those officers, Stuart has failed to provide other
information about the facts of the circumstances. Thus, there is insufficient evidence from which
a jury could infer that any of the named comparators are similarly situated to Stuart.

[5] Gutwill v. Town of Framingham, et al., 1:16-cv-12191-IT, is a related case.

Considering the lack of temporal proximity, or other evidence that would indicate a likelihood of pretext on Framingham's part, the court agrees there are insufficient facts from which a jury could link Framingham's adverse employment actions to Stuart's protected conduct. See McGunigle, 835 F.3d at 203.

Even if Stuart could show causality between his protected speech and his adverse employment action, Stuart's assertions do not "directly undermine the credibility of the proffered nondiscriminatory reasons" for any adverse actions taken against Stuart. Cepero-Rivera, 414 F.3d at 133. By proffering evidence of Stuart's violation of policy as their cause for placing Stuart on leave, and ultimately terminating him, Defendants have "met their burden to show that they would have taken the same adverse employment actions regardless of [Stuart's] . . . speech" about Simoneau. McGunigle, 835 F.3d at 205; Gonzalez-Droz, 660 F.3d at 17 (stating that evidence that a plaintiff's violation of regulations could provide the basis for a showing that "it would have reached the same decision absent the protected speech."). Thus, assuming *arguendo* that retaliatory animus influenced the process of the investigation into Stuart at some stage, Framingham has shown an independent and legitimate reason for termination in identifying Stuart's violations of police department policy, and the penalty for those violations. Report of Hearing Officer [#179-37].

Nor could a jury find that Simoneau so influenced the investigation into Stuart that absent Simoneau's alleged animus, Framingham would not have disciplined Stuart. Even if Simoneau had some involvement in the initial investigation, the ultimate decision to terminate Stuart followed a hearing process and a finding by the Hearing Officer that Stuart had violated department rules such that he was unable to perform essential job duties. Pl.'s Revised Resp. to Defs.' SOF ¶ 120-21 [#205]; Defs.' Ex. LL ("Discharge Notice") [#179-38]; Report of Hearing Officer 27 [#179-37]. Although the Hearing Officer was employed by Framingham, Plaintiff has

failed to show evidence from which a jury could find the Hearing Officer was influenced by Simoneau.

ii.     *Claims Against Simoneau*

With respect to Stuart's § 1983 claims against Simoneau, Stuart has not put forth evidence that Simoneau caused the adverse actions, or had sufficient influence over the ultimate decision maker such that Simoneau effectively caused the adverse actions. Rather, the record reflects that the investigation and ultimate termination of Stuart did not flow from Simoneau's animus, but rather that Stuart's submission of the Downing Complaint prompted an investigation into Stuart's truthfulness; that pending this investigation Stuart was placed on administrative leave; that Stuart was ultimately terminated after two decision-makers determined that Stuart had made false statements in the Downing Complaint; and that the false statements warranted a penalty of termination under Framingham's zero-tolerance policy.

B.     *State Law Claims*

1.     Massachusetts Whistleblower Act (M.G.L. c. 149, § 185(b)(1))

The Massachusetts Whistleblower Act ("MWA") establishes an employee's private right of action against a public employer if the employer takes retaliatory action against the employee for engaging in protected activities. "In order to prevail on a claim under the whistleblower statute, a plaintiff must show that he engaged in protected activity and that his participation in that activity played a substantial or motivating part in the retaliatory action." Welch v. Ciampa, 542 F.3d 927, 943 (1st Cir. 2008) (citing Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 67 (1st Cir. 2001)). Retaliatory action "include[s] discharge, suspension, demotion, or any other action that adversely affects the terms and conditions of the employment." Bennett v. City of Holyoke, 362 F.3d 1, 5 (1st Cir. 2004) (citing M.G.L. c. 149, § 185(a)(5)).

Case 1:16-cv-12559-IT   Document 220   Filed 01/22/20   Page 17 of 20

Stuart's claims under the MWA fail. As discussed above, a reasonable jury could not find

that Stuart's protected speech played a substantial or motivating part in the retaliatory action. In

addition, "a plaintiff's burden of proof under the MWA closely parallels his burden for First

Amendment discrimination under Mt. Healthy," so an employer may not be liable if it can offer

"a legitimate, nonretaliatory reason" for the retaliatory action. Pierce v. Cotuit Fire Dist., 741

F.3d 295, 303 (1st Cir. 2014). Here, Framingham has shown an independent and legitimate

reason for its actions against Stuart, namely, the results of the investigation conducted by the

independent Hearing Officer. Defs.' Resp. to Pl.'s SAMF ¶¶ 118, 174 [#210]. The findings of

this investigation—that Stuart made false statements when he submitted the Downing

Complaint—would justify termination under Framingham's zero-tolerance policy,

notwithstanding any prior protected speech. Id. ¶ 23. Accordingly, Stuart has failed to meet his

burden of proof under the MWA, and his claim fails.

## 2.   Breach of Contract

Counts IV and V of Stuart's Amended Complaint [#20] allege two contract claims

against Framingham: (1) breach of contract and (2) breach of implied covenant of good faith. To

assert a claim for breach of contract or breach of implied covenant of good faith under

Massachusetts law, Stuart must establish the existence of a contract, breach of that contract, and

damages. See Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013) (citing Singarella v. City of

Boston, 342 Mass. 385, 386 (1961)); see also Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass.

562, 570 (2010) ("The covenant of good faith and fair dealing requires that neither party shall do

anything that will have the effect of destroying or injuring the right of the other party to the fruits

of the contract.") (internal citations and quotation marks omitted). Here, Stuart's contract claims

are predicated on his assertion that the IA Policy is a contract between himself and Framingham,

and that Framingham breached the IA Policy by allowing Simoneau to participate in the FPD's

17

investigation of Stuart and the Downing Complaint. Am. Compl. ¶¶ 122; 127; 131-139; 141-145

[#20].

Stuart's contract claims against Framingham fail for two reasons. First, the terms of

Stuart's employment are governed by a CBA between Framingham and the Union. There is

neither evidence from which a reasonable jury could infer, nor legal authority to permit, an

independent contract between Stuart and Framingham. Horner v. Boston Edison Co., 45 Mass.

App. Ct. 139, 144 (1998) (employees represented by a union "surrender the ability to bargain

directly with their employer on those matters governed by a collective bargaining agreement").

At most, the IA Policy may be incorporated into the CBA, which governs termination and

discipline under its Article III ("Management Rights") and grants Framingham rights to "hire,

promote, transfer, suspend, demote, discharge and to relieve employees from duty," CBA 8

[#179-15], limited only in that "[n]o employee shall be reprimanded, suspended, discharged or

otherwise disciplined except for just cause." Id. at 9. That the CBA incorporates the IA Policy is

buttressed by the caveat that the Chief's authority to discipline subordinates can only be carried

out "in accordance with all . . . collective bargaining agreements." IA Policy 3-4 [#207-21].

Thus, Stuart cannot assert a claim for breach of contract or breach of implied covenant of good

faith and fair dealing with respect to the IA Policy without bringing such claim under the CBA.

Second, to the extent that Stuart's claims arise out of an alleged breach of the CBA, his

claims fail because Stuart has not exhausted his remedies under the CBA. The CBA sets forth the

exclusive grievance procedures for violations of the CBA. CBA 9 [#179-15]. "Employees may

not simply disregard the grievance procedures set out in a collective labor contract and go

direct[ly] to court for redress against the employer." Malden Police Patrolman's Ass'n v. Malden,

92 Mass. App. Ct. 53, 57 (2017); see also Azzi v. Western Elec. Co., 19 Mass. App. Ct. 406,

408-09 (1985) ("Before bringing an action against his employer for a violation of a collective

bargaining agreement, the employee is required to exhaust the grievance procedures") (citing

Vaca v. Sipes, 386 U.S. 171, 184 (1967)). Stuart's failure to exhaust his remedies under the CBA

precludes his contract claims relating to Framingham's alleged violation of the IA Policy.

        3.   Contract Interference Claims

Stuart alleges two contract claims against Simoneau: intentional interference with

contractual relationship (Count VI), and unlawful interference with contractual relationship

(Count VII).

        i.   *Intentional Interference with Contractual Relationship*

Stuart contends that Simoneau intentionally interfered with Stuart's contract with

Framingham, which he asserts to have been the IA Policy. Because the IA Policy is not a

contract, as previously discussed, and because the CBA was a contract between Stuart's Union

and Framingham, as opposed to an individual contract between Stuart and the city, the claim of

intentional interference must fail. See Draghetti v. Chmielewski, 416 Mass. 808, 816 (1994)

(citing G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991)) (requiring that a

party show he in fact had a contract in place to maintain an intentional interference claim).

        ii.   *Unlawful Interference with Advantageous Business Relationship*

Stuart also asserts that he had "an advantageous business relationship" with Framingham

by virtue of his employment, and that Simoneau "knowingly induced [Framingham] to break

[that] relationship." Am. Compl. ¶¶ 152-157 [#20].  A claim of interference with an

advantageous business relationship outside of a contractual relationship requires a showing that

1) the plaintiff had an advantageous relationship with a third party; 2) the defendant knowingly

induced a breaking of the relationship; 3) the defendant's interference with the relationship, in

addition to being intentional, was improper in motive or means; and 4) the plaintiff was harmed

by the defendant's actions. Hamann v. Carpenter, 937 F.3d 86, 93 (1st Cir. 2019) (quoting

Blackstone v. Cashman, 448 Mass. 255, 260 (2007)). As the court determined above, the city had

an independent and adequate reason to terminate Stuart. Therefore, Stuart cannot show that

Simoneau induced Framingham to break its employment relationship, as required to satisfy the

second element of the tort. Accordingly, the claim fails as a matter of law as well.

V.      Conclusion

For the above reasons, the court GRANTS Defendant Framingham's Motion for

Summary Judgment [#175] and GRANTS Defendant Simoneau's Motion for Summary

Judgment [#177].

IT IS SO ORDERED.

Date: January 22, 2020                          /s/ Indira Talwani
                                                United States District Judge